# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Charlotte Moore,

               Plaintiff,      Case No. 1:16-cv-01940

v.                         Michael L. Brown
                                 United States District Judge

Gwinnett County, a political
subdivision of the State of Georgia,
et al.,

               Defendants.

_____/

## OPINION & ORDER

Plaintiff Charlotte Moore sued Gwinnett County police officers and Gwinnett County claiming they violated her constitutional rights while responding to disputes she had with roommates. Defendants moved for summary judgment on all claims. Dkts. 97, 98, 100, and 102. The Court grants Defendants' motions.

## I.    Background[1]

Plaintiff Charlotte Moore rented a home located at 2267 Hudson Drive, Lilburn, Georgia.  Dkt. 95 at 8, 42.  Her lease allowed Moore to sublet rooms in the house to other people.  *Id.* at 42.  This matter arises from police response to two disputes she has with roommates — one on July 14, 2014, and one on November 27, 2015.

### A.    The July 14, 2014, Incident

Christopher Lawrence began renting a room from Moore in June 2014.  *Id.* at 86–87.  Almost immediately, he and Moore began having problems arising from Lawrence's alleged failure to comply with Moore's rules.  *Id.* at 87–88.  On July 10, 2014, Lawrence called police to complain

---

[1] The Court notes that this case is before it on Defendants' motions for summary judgment and, as such, the Court views the evidence presented by the parties in the light most favorable to Plaintiff and has drawn all justifiable inferences in favor of Plaintiff.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sunbeam TV Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013).  The Court has excluded from consideration assertions that are immaterial, presented as arguments or legal conclusions, or unsupported by citation to evidence (including page or paragraph number).  LR 56.1B(1), NDGa. The Court accepts as admitted those facts in the statements that Plaintiff has not specifically controverted with citation to the relevant portions of the record.  LR 56.1B(2), NDGa.

that Moore would not let him put juice in the refrigerator. *Id.* at 91–92; *see* Dkt. 102-6 at ¶¶ 2–3.

The next day, Moore locked Lawrence out of the kitchen after Lawrence allegedly threatened to poison Moore by "putting something" in the water supply in her refrigerator. *See* Dkt. 95 at 90, 94–96, 107–08. Lawrence called police and Defendants Justin Richey and David Leigh went to the house. Dkts. 51 at ¶ 15; 100-4 at 13–21; 100-3 at 17–18. Moore told them she wanted Lawrence "out" of her home because he was trying to poison her. Dkts. 95 at 112–16; 100-4 at 18. Because Moore refused to file a police report, the police officers told her (1) if she wanted Lawrence to leave her house, she had to go through the eviction process, and (2) so long as Lawrence remained her tenant, Moore had to give him "reasonable" access to the kitchen. Dkts. 100-4 at 18–20; 100-3 at 17–18.

On July 14, 2014, Moore went into Lawrence's locked room with her master key, collected his personal belongings, and took them to a storage facility. Dkt. 95-1 at 26–29. She also changed the locks to the house. *Id.* Moore had neither permission to do this nor a dispossessory warrant. *Id.* at 7–8, 26–28.

When Lawrence returned, he — again — called the police. Dkt. 99, Ex. 5 at 00:00:38-00:00:45.[2] Defendants Richey and Leigh went back to the house, this time with Defendant Jennifer Roberts. Dkts. 100-4 at 24; 100-3 at 29; 100-5 at 10–11.[3] They got there at about 11:00 p.m. *Id.* Lawrence told them what Moore had done, claimed the items she removed from the house included an unspecified amount of cash, and showed them paperwork he had received from Moore, specifically a document showing the address of the storage facility and a letter terminating his lease. Dkts. 100-3 at 30–32; 100-4 at 25; 95 at 118. Lawrence said he wanted to prosecute Moore for theft. Dkt. 100-4 at 32.

The three officers went to the front door. Dkts. 100-4 at 27–28; 100-3 at 34; 100-5 at 15. Although the officers' recollection of this encounter differs from Moore's, the parties agree that the officers knocked on the door and Moore answered by opening the door inwards. Dkt. 95-1 at 33–

---

[2] Dkt. 99 contains audio recordings, Exhibits 1–9 to Defendant Roberts's motion for summary judgment. Citations to these recordings reflect the time.

[3] Defendant Roberts now goes by the name Jennifer Richter. *See* Dkt. 97-7. The Court refers to her as Defendant Roberts as that was her name at the time of the events.

34.  Moore testified that she spoke with the officers while standing behind her door, which she opened just wide enough to put her arm through.[4]

Both Moore and Defendant Richey have submitted audio recordings of the encounter.  Dkts. 109; 102-3.[5]  In the recordings, Moore speaks with officers for several minutes, admitting she took Lawrence's belongings to the storage locker without his permission.  *See* Dkt. 102-3 at 00:10:28–00:11:30:00.  Moore insists she had the right to evict Lawrence because he threatened her.  The officers explain that, since she had refused to file a police report against Lawrence or get a dispossessory warrant, she had no right to do what she did.  *Id.* at 00:11:30–00:12:40.

The officers then told her that she was under arrest and asked her to step outside.  *Id.* at 00:12:40–00:12:50.  Moore continued to argue with the officers, claiming she had the right to evict him and leading to the following exchange:

> Male Officer:  Ma'am, can you step outside?  You're under arrest.  [Pause]  Ma'am, if you do not step outside we will make you step outside.
>
> Moore:  Ok, let me call my attorney.

---

[4] Moore could not remember whether she also placed her left foot in the door's opening.  But she could see the officers.  *See* Dkt. 95 at 37–42.

[5] These two docket entries are recordings submitted by the parties.  The Court cites Defendants' recording as it is of better quality.

Roberts:  No, you're not calling your attorney.

Male Officer:  You'll be able to call your attorney [inaudible] . . .

Moore:  Ok, ok, ok.  Hold on . . .

Roberts:  Step outside right now.

Moore:  I don't have shoes or nothing on.

Male Officer:  We'll get your shoes.

Moore:  No, I mean . . .

Roberts [speaking over Moore]:  [unintelligible] . . . step outside.  Say no one more time, you're gonna get an obstruction charge.  Don't you shut that door.  Get out . . .

Moore:  Ok, what are you arresting me for exactly?

Roberts:  Theft by taking.

Moore [raising voice]:  I didn't take anything.

Roberts:  Come out now.  Come out now.  [Shuffling can be overheard].  Don't shut this door on me.

Moore [raising voice]:  I didn't shut this door.  I want to get my shoes.

Roberts:  You ain't getting nothing.

Moore [yelling]:  Why can't I get my shoes?

[Shuffling in background]

Roberts:  Because that's not what I told you could do.

[Sounds of struggle continue]

Roberts [yelling]:  Give me this.

Moore [yelling]:  Why are you taking my shoes?

Male Officer:  Stop.

Moore [yelling]:  Let me . . .  I'm just . . .

Roberts [speaking over Moore]:  Because you are going to do what we tell you and nothing else.  Put your hands behind your back.

Moore [yelling]:  Wait.  Stop.  Stop.  [Moore screams]  Stop it.

Roberts [yelling]:  Back up.  Back up please.

Moore [yelling]:  Stop it.

Roberts:  You're going to get tased.

Male Officer:  Turn around.  Put it behind your back.  Put it behind your back now.

Roberts:  Put your hands behind your back now.

Male Officer:  Put your hands behind your back now.

Moore:  I can't.  Wait a minute . . . [garbled]

Roberts [speaking over Moore]:  Put them down.  Put them down.

Male Officer:  Put it behind your back.

[A sound that appears to be a taser discharging can be heard]

Male Officer:  Put your hands behind your back.

[Moore can be heard screaming in the background over the sound of a struggle.  The sound of a taser continues]

Male Officer:  Put your hands behind your back.

Moore [shouting]:  [unintelligible]

Male Officer:  Turn around.  Turn around.

Moore [yelling]:  [unintelligible]

Male Officer:  Ma'am, if you do not turn around, you're gonna get tased.  You're gonna get tased again.  You're gonna get tased.

Moore [shouting]:  No, I can't . . . [unintelligible]

Male Officer:  Turn around.

Multiple Officers [yelling over one another]:  Ma'am, put your hands behind your back.

Moore:  Ok . . .

Male Officer:  Put it behind your back.

Roberts [yelling]:  Now.

Male Officer [yelling]:  Put them behind your back.  Put them behind your back now.

Moore:  I'm trying to . . . [unintelligible]

> Male Officer:  Nobody stand up.  Put your hands behind your back.

*Id.* at 00:12:40–00:15:05.[6]  Although the audio continues beyond this point, there is no further struggle or indication that Defendant Richey tased her again.

Moore testified about the encounter.  She claimed that, in response to officers' attempts to "coax" her outside without her shoes on, she first refused to step outside but then turned around and "bent down" to get her shoes with the intention of surrendering.  Dkt. 95-1 at 42–44.  Moore testified that she abruptly "blacked out," does not know if these Defendants tased her while she was out, and has no memory until she woke up moments later.  *Id.* at 45, 54–55; Dkt. 95-2 at 3–5.  She explained:

> Q:  So you don't recall being tased the first time.  Because you told me you don't recall anything from saying, "Let me get my shoes" and when you woke up on the floor.
>
> Moore:  Right.

---

[6] The quality of the recording is poor and the events chaotic.  And while Defendant Roberts's and Moore's voice are identifiable, it is hard to discern which man is speaking.  So "Male Officer" identifies either Defendant Leigh or Defendant Richey.

Q: Okay.

Moore: I didn't actually feel the Taser itself. I was blacked out. Whatever they did to me, it — I blacked out.

Q: So it's possible you weren't tased at all in that time frame, because you don't remember?

Moore: I don't think it was possible that I wasn't tased.

Q: But you don't remember?

Moore: Unless they poisoned me or did something else to me. Something happened to me. They did something to me.

Q: All you know is that you blacked out?

Moore: All I know is I woke up on the floor and they were all over me.

Q: And you don't remember anything other than hearing commands and saying, I'm going to get my shoes, before you woke up on the floor?

Moore: Exactly.

Dkt. 95-2 at 21–22.

Moore testified that Defendant Richey then tased her several times but struggled to recollect the specific circumstances and chronology. She said that, when she "came to" not long after blacking out, she was lying on the floor on her right side, with Defendant Roberts "twist[ing]" one of her arms in "some kind of way where [she] couldn't do anything" and

10

telling Moore "either put your hands behind your back or give me your hand or something."  Dkt. 95-1 at 45–46.  As Defendant Roberts "kept saying . . . give me your hand," Defendant Richey "walked up" to Moore and took her phone from her other hand, at which time she blacked out again.  *Id.* at 47–48.  Moore testified:

Q:  . . . And then did they place you in handcuffs?

Moore:  No.

Q:  What happened next?

Moore:  At that point, I blacked out again.

Q:  Do you know why you blacked out?

Moore:  I'm going to assume it was because I was tased again.

Q:  But you don't know.

Moore:  There were several tasings.

Q:  You think that you were tased more than once?

Moore:  Yes.

Q:  And why do you believe that?

Moore:  Because I do remember certain tases.

*Id.* at 48.

When she woke up the second time, the officers had repositioned Moore so that she was sitting up. She heard Defendant Roberts saying "[h]e's going to tase you" and saw Defendant Richey pointing his taser at her eye, then she blacked out again. *Id.* at 50–52. Moore testified that she "remember[ed] things going dim" and "feeling [herself] slump over," at which point she felt Defendant Richey tase her in the back. *Id.* at 53. She blacked out for a third time, then woke up shortly afterwards "screaming" and "laying flat on [her] back" as Defendant Richey tased her on the leg. *Id.* at 55–56. Moore testified that, after this final tasing — Moore could not recall whether this was the third or fourth in total — the officers "stood [her] up" and handcuffed her. *Id.* at 56–57.

The police officers told a different story. All three testified that Moore started to retreat into her house, saying she needed to get her shoes. Dkts. 100-3 at 39–41; 100-5 at 19–20; 100-4 at 33–35. Defendant Leigh then reached out and grabbed Moore's left arm to stop her from getting something from a "nightside stand" visible inside the dark foyer. *Id.* At the same time, Defendant Roberts grabbed Moore's right arm, causing her to "backpedal" away from the officers into the home and pulling the officers inside. Dkts. 100-5 at 20–21; 100-4 at 41; 100-3 at 43.

The officers' uncontested recollection is that Moore then continued to struggle — "thrashing," "kicking," and trying to pull away. Dkts. 100-3 at 41–42; 100-4 at 36–43; 100-5 at 21–22. She resisted their repeated requests that she place her hands behind her back, at one point allegedly kicking Defendant Richey in the groin. Dkts. 100-3 at 44–45; 100-3 at 23; 100-4 at 36, 42–43. Because Moore continued to struggle, Defendant Richey removed his taser and, after requesting "a couple times" that Moore place her hands behind her back, stunned her in the back. Dkts. 100-4 at 36–37, 40–41; 100-5 at 25–26. He used the taser's "drive stun" mode, meaning that he placed the taser against her skin rather than shooing darts at her. Dkts. 100-4 at 36–37, 40–41; 100-5 at 25–26 (testifying that she saw Defendant Richey tase Moore once); *see also* Dkt. 100-3 at 48–50 (testifying that he did not see Defendant Richey tase Moore because he was "watching Moore's hands to make sure she didn't grab whatever was on the nightside stand.").

Defendant Richey testified that he pulled the trigger once — triggering a five second, continual tase. Dkt. 100-4 at 40. The device, however, contacted Moore's back twice: once when Defendant Richey first put it to her skin and a second time when she "jerked forward" and he

had to re-apply it "a little bit lower on [her] back." Dkt. 100-4 at 40–41. Defendant Richey denied tasing Moore more than once or tasing her on the leg. *Id.* The taser has a log file which confirmed that it was "fired" only once — that is, emitted only one five-second tase. *Id.* at 41; Dkt. 102-6 at 19–21; *see* Dkt. 102-6 at ¶ 5 (stating that the July 14, 2014, entry log for Defendant Richey's taser shows that he discharged the device once). Although Moore continued to struggle for a brief period after being tased and these Defendants threatened to tase her again if she did not comply, she ultimately relented and obeyed Defendants' commands. Dkts. 100-4 at 44–45; 100-5 at 25–26. They handcuffed her and took her to the Gwinnett County Jail. *Id.*

These Defendants charged Moore with obstruction of a law enforcement officer in violation of O.C.G.A. § 16-10-24. Dkt. 102-5. The State later dismissed the charge. *Id.*

## B.    The November 27, 2015, Incident

On November 27, 2015, Moore had another problem with a different roommate. On that day, Defendant Law went to her home and spoke with Moore and her tenant, Shannon Daley. Dkts. 95-3 at 13; 100-7 at 9. Moore said that she had been renting a room to Daley, put his belongings

on the curb, and wanted him arrested for criminal trespass. Dkts. 95-3 at 359, 364; 100-7 at 11. Moore said she had tried to get a dispossessory warrant for Daley but had not yet gotten it. Dkts. 95-3 at 359–61, 370; 100-7 at 11. Daley said he was willing to leave but needed to get some of his belongings still in the house, specifically a modem and $740 in cash. Dkt. 100-7 at 11, 22.

Defendant Law told Moore that he would not arrest Daley because he still had a right to be in the house. Dkt. 100-7 at 12. Moore then asked to speak with Defendant Law's supervisor. Dkt. 100-7 at 16. Defendant Skelly — the supervisor — came to the house and told Moore the same thing. Dkts. 100-7 at 17–18; 95-3 at 362–63; 100-6 at 11–12. Still unsatisfied, Moore claims she "insisted on [speaking to] a lieutenant." Dkt. 95-3 at 16. Police then called Defendant Rozier to her house. Dkt. 106-6 at 10–12.

While waiting, Defendant Law called a magistrate judge and obtained an arrest warrant for Moore, charging her with trespassing under O.C.G.A. § 16-10-24(a) for refusing to let Daley get his things from the house. Dkts. 100-7 at 19–20; 100-8 at 1. Defendant Law went back to the precinct to get the warrant. Dkt. 100-7 at 20.

When he returned, Rozier was speaking with Moore through a window of the house. Dkts. 100-7 at 20; 100-6 at 13–14. Officers told her they would arrest her unless she allowed Daley to enter the house and get his property. Dkts. 95-3 at 365, 367–69; 100-7 at 24–25; 100-6 at 17. She agreed to let them in. Daley (with either Defendant Law or Rozier) then entered the home to get his things. Dkts. 100-7 at 23–24; 100-6 at 17–21. The police then left and recalled the warrant. Dkts. 100-6 at 18; 100-7 at 23–24; *see* Dkt. 100-8 at 2 (stating that police recalled the warrant after "[a]ccused agreed to allow victim to regain access to premises before execution of warrant."). Police neither arrested Moore nor told her she was under arrest. *See* Dkts. 95-3 at 365; 100-7 at 23–24; 100-6 at 22–23.[7]

## C. Moore's Claims in the First Amended Complaint

Moore's amended complaint is hard to understand. She fails to identify which incident gives rise to her claims, the defendant(s) she

---

[7] Rozier and Defendant Law testified that Daley accompanied Rozier while Defendant Law remained outside. Dkts. 100-7 at 21–22; 100-6 at 17–18. Moore testified that Defendant Law entered the house with Daley. Dkt. 95-3 at 366–67, 370–71. It is also unclear whether Daley recovered his modem, but he never found his $740 in cash. Dkts. 100-6 at 18–19; 95-3 at 371. These factual disputes are irrelevant to the issues here.

names in each count, or the capacity in which she sued them. Although Moore's amended complaint does not refer to 42 U.S.C. § 1983, she appears to have brought all of her claims under this statute.

The Court believes that Moore brings Counts One through Four based on the July 14, 2014, incident and against Defendants Richey, Leigh, and Roberts. In Count One, for example, Moore alleges the "actions of the individual Defendant's [sic] constitutes a violation of [Moore's] right against unreasonable search and seizure" in violation of the Fourth Amendment, and also alleges, without explanation, that (1) Moore's arrest was illegal because "[a] landlord/tenant dispute is purely a civil matter" over which "the police have no jurisdiction whatsoever," and (2) "Defendants tried to cover their actions by claiming the right to enter the premises based on domestic violence even though there was no violence involved." Dkt. 51 at ¶¶ 63–67. In Count Two, she alleges "[t]he Defendant's [sic] entry" into her home without a warrant violated her rights under the Fourth Amendment, and that no exigent circumstances justified Defendants' entry. *Id.* at ¶¶ 72–75. In Count Three, she alleges that (1) "[t]he Defendant's [sic] arrest of [Moore] on charges they knew were false constitutes a violation of her Constitutional

Right to Due Process of Law," and further that (2) Defendant Officer Leigh "violated [Moore's] right to due process and equal protection by taking the physical evidence, including the receipt and notice from the storage unit, and carrying the evidence in his car rather than preserving it and turning it into the police evidence room." *Id.* at ¶¶ 78–83. Finally, in Count Four she alleges that "the Defendant's use of a teaser [sic] and shooting the Defendant [sic] with the teaser [sic] multiple times constitutes excessive force" because Moore posed no threat to officers, and further that, "[e]ven if [Moore] had resisted, the only resistance . . . was to try to call her attorney and to remain inside her own home." *Id.* at ¶¶ 84–95.

The Court believes that Count Five — brought against Gwinnett County — arises from both her July 14, 2014, arrest and her treatment on November 27, 2015. In this count, Moore claims the county (1) failed to train its law enforcement officers "to know the difference between civil and criminal conduct"; (2) failed to establish policies "that prevent its police officers from interfering in civil disputes between landlords and tenants," and instead "condones its police's interference between landlord and tennant [sic]"; and (3) established custom or policy that "allows its

police to use deadly force, via Taser [sic], even though no resistance was encountered by the office [sic]." *Id.* at ¶¶ 96–103.

Moore makes many additional allegations about the July 14, 2014, incident. She claims that Defendants "falsely swore" she had kicked one of them and filed "false police reports and false charges" against her. Dkt. 51 at ¶¶ 37–38, 41. She also claims that Defendant Leigh made "false accusations and charges" against Moore "in order to obtain a warrant to cover [Defendants'] illegal actions." *Id.* Moore concedes that an internal affairs investigation appears to have determined the officers' actions were "within the policy, practice, and/or custom of Gwinnett County Police." But she claims the investigation "whitewashed the incident" to reach this conclusion. *Id.* at ¶ 62.[8] Moore neither asserts a claim against any Defendant based on these allegations nor presented evidence to support them.

---

[8] Moore attached only a selection of pages from this report. Dkts. 107-1 to 107-13. The record does not include the full report. But it does include a December 10, 2014, letter from Lieutenant J.D. McClure, Commander of the Gwinnett County Police Department's Office of Professional Standards, to Defendant Leigh, stating that, after a "thorough investigation," his office had found the allegations against her "not sustained" and closed the matter.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "No genuine issue of material facts exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.'" *Am. Fed'n of Labor & Cong. Of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186–87 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

The moving party bears the initial responsibility of asserting the basis for her motion. *Catrett*, 477 U.S. at 323. The movant is not, however, required to negate the non-movant's claim. *Id.* at 324. Instead, the moving party may meet her burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the non[-]moving party's case." *Id.* at 325 (internal quotation marks omitted). After the moving party has carried its burden, the non-moving

party must present competent evidence that there is a genuine issue for trial. *Id.*

The Court must view all evidence and factual inferences in a light most favorable to the non-moving party. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

## III. Discussion

### A. Claims against Gwinnett County

"It is well established that [42 U.S.C. §] 1983 itself creates no substantive rights; it merely provides a remedy for deprivations of federal rights established elsewhere." *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). To sustain a cause of action based on § 1983, a litigant must establish two elements: (1) that he suffered a deprivation of a right, privilege, or immunity protected by the U.S. Constitution or federal law, and (2) that a person acting under color of state law caused the deprivation. *Arrington v. Cobb Cty.*, 139 F.3d 865,

872 (11th Cir. 1998). "[S]ection 1983 imposes liability only 'for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.'" *Wideman*, 826 F.2d at 1032 (quoting *Baker v. McCollan*, 443 U.S. 137, 146 (1979)). So "[i]n any § 1983 action, a court must determine 'whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' of the United States.'" *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting *Baker*, 443 U.S. at 140). "Absent the existence of an underlying constitutional right, no § 1983 claim will lie." *Wideman*, 826 F.2d at 1032.

Count Five includes Moore's claims against Gwinnett County. A plaintiff seeking to hold a local government, such as Gwinnett County, liable under § 1983 cannot rely on the theory of *respondeat superior*; instead, liability must stem from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy . . . ." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978); *see also Denno ex rel. Denno v. School Bd. of Volusia Cty.*, 218 F.3d 1267, 1276 (11th Cir. 2000) (citing *Monell*, 436 U.S. at 694). Because a county is "liable under section 1983 only for acts for which the [county] government is actually

responsible," *Marsh v. Butler Cty.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc), a plaintiff "must identify a municipal policy or custom that caused . . . injury." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (citation and internal punctuation omitted).

> To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. Normally random acts or isolated incidents are insufficient to establish a custom or policy.

*Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986). A plaintiff must show that the county's custom or practice is "the moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (internal punctuation and citation omitted). A plaintiff "has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329 (citing *Monell*, 436 U.S. at 690–91); *see also Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989) ("Under this theory of municipal liability, the first step of the inquiry is to identify those individuals whose decisions represent the official policy of the local governmental unit.").

To hold a municipality liable under § 1983 for failing to train or supervise subordinates, a plaintiff must show that the "failure to train amounts to deliberate indifference to the rights of persons with whom the [police] [came] into contact and the failure has actually caused the injury of which the plaintiff complains." *Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994) (internal quotation marks omitted). "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350–51 (11th Cir. 1998).

Moore seems to raise three claims against the County but fails to raise a material issue of fact in support of each. First, she claims that the County failed to establish policies "that prevent its police officers from interfering in civil disputes between landlords and tenants," and instead "condones its police's interference between landlord and tennant [sic]." Dkt. 51 at ¶¶ 99–100. In her response to summary judgment, she alleges the County "does not provide any training or policies concerning how to handle landlord/tennant [sic] disputes[,] . . . [e]ven though

landlord/tennant [sic] disputes appear to be very common in Gwinnett."
Dkt. 106 at 17–18.

Moore fails to explain how or why any of the constitutional violations alleged in her amended complaint resulted from such a policy (or lack thereof). And she presents no evidence to suggest the County was on notice of a need to train its officers about landlord/tenant disputes.

Second, Moore alleges that the County has an established policy of "allow[ing] its police to use deadly force, via Taser [sic], even though no resistance was encountered by the office [sic]." Dkt. 51 at ¶ 101. The Eleventh Circuit has described a taser as a "non-deadly weapon." *See Fils v. City of Aventura*, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011) ("A 'taser' is a non-deadly weapon commonly carried by law enforcement."). Her claim that the taser constituted deadly force fails as a matter of law. And Plaintiff points to no evidence that Defendant Richey improperly used the taser on her in a matter that amounted to deadly force.

Even if Moore presented that evidence, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by

an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 841 (citation and quotation omitted). The record contains no evidence that the County had an official policy of using the taser against suspects who are not resisting arrest or in an improper manner as a deadly weapon. The record also contains no evidence of repeated acts or incidents that establish an unofficial custom or practice of using tasers in this way. Moore simply presented no such evidence.

Third, Moore alleges the County failed to train its officers to "know the difference between civil and criminal conduct." Dkt. 51 at ¶ 98. She offers no further explanation. She also fails to identify any previous incident that would have put the County on notice of a need to provide this training. She points to one other incident when police came to her house after receiving a call from a "code enforcement officer" and entered allegedly to investigate a break-in. Dkt. 106 at 18. But, that matter involved neither a dispute between a landlord and tenant nor the allegedly improper use of a taser — the policies she cites in this case. Moore has thus failed to raise a genuine issue of material fact in support of this claim.

The Court grants Defendant Gwinnett County's motion for summary judgment on Count Five of the amended complaint.[9]

## B. Individual Capacity Claims — Defendants Leigh, Richey, and Roberts

Defendants Leigh, Richey, and Roberts say they are entitled to qualified immunity on all of Moore's claims arising from her arrest on July 14, 2014. Dkts. 98, 100, 102.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted). So "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*,

---

[9] As noted above, Moore fails to specify whether she directs any of the counts in her amended complaint against Defendants Law, Richey, Roberts, or Leigh in their official capacities. If she did, they would be treated as claims against Gwinnett County and fail as well. *See Molette v. Georgia*, 469 F. App'x 766, 768 (11th Cir. 2012) ("A suit against a public official in his official capacity is . . . treated as a suit against the local government entity he represents, assuming that the entity receives notice and an opportunity to respond.") (internal citations omitted).

563 U.S. 731, 743 (2011). Qualified immunity allows officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). When properly applied, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010). A public official acts within the scope of his discretionary authority where the acts complained of were "undertaken pursuant to the performance of his duties and within the scope of his authority." *See Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. There is no dispute that Defendants Leigh, Richey, and Roberts were acting in the scope of their discretionary authority when they arrested Moore on July 14, 2014. *See, e.g., Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir.

2004) (holding that a deputy making an arrest is performing a discretionary function because "making an arrest is within the official responsibilities of a sheriff's deputy").  Moore, thus, has the burden of showing that qualified immunity is unavailable to Defendants Richey, Roberts, and Leigh.

The qualified immunity analysis presents two questions: first, whether the allegations taken as true establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred.  *Hadley v. Gutierrez,* 526 F.3d 1324, 1329 (11th Cir. 2008).  These distinct questions "do not have to be analyzed sequentially; if the law was not clearly established, [the court] need not decide if the [d]efendants actually violated the [plaintiff's] rights, although [the court is] permitted to do so."  *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).

A constitutional right is only clearly established for qualified immunity purposes if "every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (internal quotation marks omitted) (alteration adopted).  Put differently, "existing precedent must have placed the statutory or

constitutional question beyond debate" to give the official fair warning that his conduct violated the law. *Id.*; *Coffin v. Brandau,* 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("The critical inquiry is whether the law provided [defendant officers] with 'fair warning' that their conduct violated the Fourth Amendment."). The Supreme Court has explained that the question is "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *See Saucier v. Katz*, 533 U.S. 194, 194–95 (2001). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202.

A plaintiff typically shows that a defendant's conduct violated clearly established law by pointing to "materially similar precedent from the Supreme Court, [the Eleventh Circuit], or the highest state court in which the case arose." *Gates*, 884 F.3d at 1296. While the facts of the case need not be identical, "the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin,* 642 F.3d at 1013.

In *White v. Pauly*, the Supreme Court reiterated "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' " 137 S. Ct. 548, 552 (2017) (quoting *al-Kidd*, 563

U.S. at 742). The Supreme Court held that to defeat a claim of qualified immunity, a plaintiff must "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *Id.* "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* (internal quotation marks omitted). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* The Supreme Court also has explained that avoiding qualified immunity does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

Fair warning can also arise from two other sources. First, "[a]uthoritative judicial decisions may 'establish broad principles of law' that are clearly applicable to the conduct at issue." *Gates*, 884 F.3d at 1296 (quoting *Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1209 (11th Cir. 2007)). Second, "it may be obvious from 'explicit statutory or constitutional statements' that conduct is unconstitutional." *Id.* (citing *Griffin Indus.*, 496 F.3d at 1208–09). Regardless of the method, the preexisting law must "make it obvious that the defendant's acts violated

the plaintiff's rights in the specific set of circumstances at issue." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). In this way, qualified immunity does what it should: it "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted) (alterations adopted).

Because Moore seems to assert these claims against all three officers collectively, the Court analyzes their qualified immunity defenses together.

### 1.     False Arrest (Counts One and Three)

Counts One and Three of Moore's amended complaint appear to allege that Defendants Richey, Leigh, and Roberts violated her constitutional rights when they arrested her in July 2014 because they knew Moore's arrest was "improper," "illegal," and based on "false charges." *See* Dkt. 51 at ¶¶ 63, 67 (alleging, in Count One, that the officers' arrest of Moore violated her "right against unreasonable search and seizure, as guaranteed by the 4th amendment"), ¶ 78 (alleging, in Count Three, that "[t]he Defendant's [sic] arrest of [Moore] on charges

they knew were false, constitutes a violation of her Constitutional Right to Due Process of Law."). Despite Moore's various characterizations of this cause of action, the Court construes her allegations as a single claim that Defendants Richey, Roberts, and Leigh arrested Moore without probable cause in violation of the Fourth Amendment.

To be sure, a "warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). On the other hand, the existence of probable cause is an absolute bar to a claim of unlawful arrest under the Fourth Amendment. *See Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) ("An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest.").

An officer has probable cause to arrest "if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Carter v. Butts Cty.*, 821 F.3d 1310, 1319 (11th Cir. 2016); *see also Boyd v. State*, 658 S.E.2d 782, 784 (Ga. Ct. App. 2008) (internal quotation marks omitted) (alterations adopted)

(finding probable cause "if, considering the totality of the circumstances, at the time of arrest he had a reasonable belief that the defendant had committed a crime in his presence or within his knowledge"). Importantly, the test for qualified immunity is not whether the officer actually had probable cause to support the arrest. The test is whether arguable probable cause exists. In other words, "[e]ven without actual probable cause . . . a police officer is entitled to qualified immunity if he had only 'arguable' probable cause to arrest the plaintiff." *Gates*, 884 F.3d at 1298.

Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] *could* have believed that probable cause existed to arrest." *Id.* (citing *Redd v. City of Enterprise*, 140 F.3d 1378, 1383–84 (11th Cir. 1998)). Arguable probable cause provides protection from both Fourth Amendment claims for false arrest and First Amendment claims stemming from an arrest. *Id.* at 1298; *see also Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013) ("[A]n arrest may be for a different crime from the one for which probable cause actually exists, . . . but arguable

probable cause to arrest for *some* offense must exist in order for officers to assert qualified immunity from suit." (citations omitted)).

Based on the undisputed material facts, the Court finds that, in the light of the totality of circumstances, Defendants Richey, Roberts, and Leigh had a reasonable belief that, at the time of the arrest, Moore had committed the offense of theft by taking or trespassing. Alternatively, even if they did not have probable cause to arrest Moore, they at least had arguable probable cause — that is, the Court finds that a reasonable officer in the officers' position could have believed he or she had probable cause to arrest Plaintiff for theft by taking or trespassing.

Georgia law provides that a person commits the offense of theft by taking when the person "unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." O.C.G.A. 16-8-2. It is undisputed that Moore had taken Lawrence's property without his permission. She told Defendants Richey, Roberts, and Leigh that she had taken Lawrence's property to a storage locker without his permission. *See* Dkt. 102-3 at 00:10:28:00–00:11:30:00. This constituted deprivation of Lawrence's property under Georgia's criminal code, which

35

defines "deprivation" as "without justification[,] [t]o withhold property of another permanently *or temporarily*." O.C.G.A. § 16-8-1(1)(A) (emphasis added). Defendants Richey, Roberts, and Leigh thus had probable cause — or at least arguable probable cause — to arrest Moore for theft by taking. *See Ferrell v. State*, 172 Ga. App. 238, 238 (1984) ("The intent to withhold property of another even temporarily satisfies the mens rea requirement of the theft by taking statute. Thus it is irrelevant whether deprivation was permanent or temporary."); *see also Wells v. State*, 226 Ga. App. 172, 174 (1997).

Georgia's criminal trespass statute states that

[a] person commits the offense of criminal trespass when he or she intentionally damages any property of another without consent of that other person and the damage thereto is $500.00 or less *or knowingly and maliciously interferes with the possession or use of the property of another person without consent of that person.*

O.C.G.A. § 16-7-21(a) (emphasis added). Based on their knowledge that Moore had taken Lawrence's property to a storage facility eight miles away without his permission, Defendants Leigh, Richey, and Roberts had reason to conclude she knowingly and maliciously interfered with his use or possession of that property. They had probable cause to arrest her for criminal trespass.

Moore argues that Georgia law allowed her to evict Lawrence without an order of eviction. She relies on O.C.G.A. § 43-21-3.1, which authorizes the keeper of a "hotel, apartment hotel, boarding house, inn, or other accommodations furnished on a day-to-day or weekly basis" to terminate a guest's occupancy without notice "for cause, such as failure to pay sums due, failure to abide by rules of occupancy, failure to have or maintain reservations, or other action by a guest." O.C.G.A. § 43-21-3.1(a) and (b). So she alleges Defendants lacked probable cause to arrest her for interfering with Lawrence's property. Dkt. 106 at 12.

She raised this argument for the first time in her response brief. She has thus waived it. *See Miccosukee Tribe of Indians of Florida v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."); *see also Boone v. City of McDonough*, 571 F. App'x 746, 751 (11th Cir. 2014) (finding plaintiff waived alternative asserted basis for defendant's liability where raised for the first time in response to defendant's summary judgment motion).

Even if not waived, her claim would fail for two reasons. First, Moore introduced no evidence that her home was a "hotel, boarding house, inn, or other accommodation furnished on a day-to-day or weekly basis" under O.C.G.A. § 43-21-3.1 or that Lawrence was a mere guest in such an establishment.[10] Indeed, the undisputed evidence shows Lawrence and Moore entered into a three-month lease just days before her arrest. Dkts. 51 at ¶¶ 11–12, 44; 95-4 at 1; *see also* Dkt. 95 at 82. She also referred to Lawrence (and Daly) as "tenants" — not guests — in the amended complaint. *See* Dkt. 51 at ¶¶ 11–12, 44. Second, no evidence suggests these Defendants should have considered Moore innkeeper or an operator of a hotel or boarding house when she spoke to the officers. Moore's recent claim that Georgia law justified her actions as an innkeeper does not undermine the officers' belief — at the time — that they had probable cause to arrest her.

The undisputed facts establish that a reasonable officer in the circumstances facing Defendants Richey, Roberts, and Leigh and possessing the same knowledge they had could have reasonably believed

---

[10] The same code section defines an "inn" as "all taverns, hotels, and houses of public general entertainment for guests." O.C.G.A. § 43-21-1.

they had probable cause to arrest Moore on July 14, 2014, for theft-by-taking or criminal trespass. Moore fails to carry her burden of establishing the first prong of the qualified immunity analysis — that these Defendants violated her Fourth Amendment rights.

Moore also fails to meet her burden of showing that the right Defendants' allegedly violated was clearly established at the time of the arrest. The core question on this prong of the qualified immunity analysis is "whether it was already clearly established, as a matter of law, that at the time of [Moore's] arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest [Moore] under the particular circumstances Defendants confronted." *Gates*, 884 F.3d at 1303.

The Fourth Amendment requires probable cause for an arrest. That general right is irrelevant to the fact-specific analysis required for qualified immunity. Instead, Moore has the burden of identifying some legal precedent precluding Defendants' conduct under these circumstances. She cites no "materially similar precedent" existing at the time from the Supreme Court, this Circuit, or the Georgia Supreme Court that would have put every reasonable officer on notice that it was

unlawful to arrest her when she took Lawrence's property without his permission and locked him out of the house in which he had the right to live.

Moore identified two cases — neither meeting this burden. First, she cites *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998). In that case, police tried to mediate a dispute between two former roommates, which the court described as acting outside their role as law enforcement officers. *Id.* at 1399. One of the roommates refused to speak with the officers, went into his house, and spoke with them through the screen door, telling them to leave him alone. *Id.* at 1398. The plaintiff committed no crime in refusing to mediate his dispute through the police. *Id.* It was thus undisputed that the officers had no probable cause to believe he had committed an offense or threatened anyone. Yet they entered his house, wrestled him to the ground, and arrested him for obstruction. *Id.* at 1399.

*Thornton* provided no guidance for Defendants Richey, Leigh, and Roberts when confronted with probable cause to believe Moore committed the offense of theft by taking or trespassing. Precedent establishing that police cannot enter a house to arrest a person simply for refusing to speak

with the police would not have put a reasonable officer on notice that it was unlawful to arrest Moore for theft by taking or trespassing when she admitted to removing Lawrence's property from the house and taking it to a storage facility.

Moore also cites *Gray v. Ferdarko*, 982 F. Supp. 2d 1348 (N.D. GA. 2013), *aff'd* 564 F. App'x. 1001 (11th Cir. 2014). Although somewhat closer to the facts here because it also involved a roommate who removed another roommate's property from their shared home, *Fedarko* does not clearly establish that Defendants Richey, Leigh, and Roberts violated Moore's Fourth Amendment rights. In that case, plaintiff removed her roommate's property from their house, placed it in the bed of the roommate's pick-up truck, covered it with a tarp to protect it from rain, and locked the roommate out of the house. *Id.* at 1349. The officers never investigated whether the plaintiff had damaged the property before arresting her for criminal damage to property. *Id.* at 1352. In denying qualified immunity, the district court held that, because the officers conducted no investigation, they had no probable cause to arrest plaintiff, making the arrest unconstitutional. *Id.* The Eleventh Circuit affirmed. *Id.*

In this case, Defendants Richey, Leigh, and Roberts conducted an investigation. They spoke with Lawrence who told them Moore had moved his items to the storage facility. Dkts. 100-3 at 30–32; 100-4 at 25; 95 at 118. He also provided them a copy of the paperwork she had given him showing where it was. *Id.* Moore even admitted to doing so. Dkt. 102-3 at 00:10:28–00:11:30:00. Unlike the officers in *Fedarko*, these Defendants had a factual basis for determining there was probable cause to arrest Moore. The decision in *Fedarko* would not have placed a reasonable officer on notice that the conduct of these Defendants was illegal.

The Court grants Defendants' motions for summary judgment as to Counts One and Three of the amended complaint on the grounds of qualified immunity.

## 2. Warrantless Entry (Count Two)

In Count Two, Moore appears to allege that Defendants Roberts, Leigh, and Richey violated her rights under the Fourth Amendment when executing Moore's arrest, they entered into the foyer of her home and arrested her without a warrant. Dkt. 51 at ¶ 11. When an arrest "(1) occurs within the arrested person's home and (2) is not accompanied

by either an arrest or search warrant, the plaintiff must prove that the officer's presence in the her [sic] home was unlawful to establish a constitutional violation." *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008).

In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id.* at 576. There are a few exceptions to the prohibition against a warrantless entry into a home. Consent is an exception. *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990) (prohibition against warrantless entry does not apply when person with authority provides consent). Exigent circumstances or "situations in which the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action" provide another exception. *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007) (quoting *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983)). Courts have applied this exception in several situations, including when entry is necessary to "break up a violent fight, to prevent the destruction of evidence, to put out a fire in a burning building, to pursue a fleeing suspect, to rescue a

kidnapped infant, . . . and to attend to a stabbing victim." *Id.* (collecting cases) (internal citations omitted). This exception applies when the circumstances present a "danger to the arresting officers or the public." *Bates*, 518 F.3d at 1245–46 (quoting *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986)). "But where probable cause exists to believe that only a minor offense has been committed, 'application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned.'" *Bratt v. Genovese*, 660 F. App'x 837, 841 (11th Cir. 2016) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). An officer who conducts a warrantless search or seizure in a home bears the burden of proving the law justified his or her conduct. *McClish*, 483 F.3d at 1241.

The officers argue exigent circumstances justified their entry into Moore's foyer — specifically, their belief that Moore posed an imminent risk of serious injury to them in the moments after they informed her that she was under arrest. Dkts. 100-2 at 12–13; 102-2 at 13–14. Moore concedes she placed one arm out the door when she opened it. Dkt. 95-1 at 37–38. She also admitted that, after officers told her she was under arrest, she turned away and bent down to get her shoes, then blacked out. Dkts. 95-1 at 160–63, 172–73; 95-2 at 253–55.

At his deposition, Defendant Leigh testified that in this moment —
as Moore turned away and bent down — he reached out and grasped
Moore's left arm to stop her from retreating into her home and grabbing
an unknown item from a "nightside stand" visible inside the dark foyer,
an item that he feared might be a weapon. Dkts. 102-6 at 41; *see* Dkts.
100-5 at 19–20; 100-3 at 33–35. As explained above, Defendant Roberts
grabbed Moore's right arm at about the same time, prompting Moore to
"backpedal" away from the officers into the home, pulling both
Defendants Roberts and Leigh inside. Dkts. 100-3 at 20–21; 100-4 at 41;
100-3 at 43.

Moore does not respond to the officers' argument that exigent
circumstances justified their warrantless entry into her home. The Court
thus determines that she has abandoned her claim. *See Hudson v.
Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a
party fails to respond to an argument or otherwise address a claim, the
Court deems such argument or claim abandoned.") (citing *Resolution Tr.
Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).

Even if she had responded and viewing the facts in the light most
favorable to Moore, the Court finds that a reasonable officer in

Defendants Leigh, Roberts, or Richey's position could have believed that Moore's conduct — her decision, after being told that she was under arrest, to turn away from the officers towards her home's dark foyer and reach for an unknown object — presented an imminent risk of serious injury to them, thus justifying their warrantless entry into her home. The recording shows that the officers instructed her to come out of the house and not to close her door. See Dkt. 102-3 at 00:10:28–00:11:30:00. An officer does not violate the Fourth Amendment by instructing a suspect to come out of the home and then arresting the suspect. *Knight v. Jacobson*, 300 F.3d 1272, 1277 (11th Cir. 2002). In addition, Moore admits that she placed her arm outside the door. So, when the officers grabbed that arm, they were not violating the threshold of her home. Moore does not deny — and the audio recording confirms — that she was trying to back into her house and retrieve something. While she claims she only wanted her shoes, the officers did not have to believe her then and could have feared she might grab a weapon. "It is well-established that exigent circumstances exist when failure to act may result in harm to police officers or the general public." *Newton v. City of Huntsville,*

*Alabama*, No. 5:07-CV-1178, 2009 WL 10703364, at *10 (N.D. Ala. July 9, 2009)

Moore has also failed to show that the officers' conduct violated clearly established law. The Supreme Court's decision in *Payton* made it clear that police cannot enter a suspect's home without a warrant or consent to make a routine felony arrest. But it was also clearly established that police can do so when facing exigent circumstances. What was not clearly established was whether the circumstances these Defendants faced on the day of the arrest satisfied the exigency requirement. Moore has the burden of showing that it was clearly established that these Defendants could not enter her home in the manner they did under the particular circumstances they faced. Put differently, she has the burden of showing that that a reasonable officer would have known that the circumstances Defendants Richey, Leigh, and Roberts confronted were not exigent enough to allow them to act as they did. She must show that a reasonable officer would know that, when she retreated into the house to pick something up, they had to release their grips on her arms rather than allowing her to pull them inside. "Although exact factual identity with a previously decided case is not

required, the conduct must have been clearly unlawful in light of pre-existing law." *McClish*, 483 F.3d at 1248.

Moore introduced no authority to meet her burden. And the Court is aware of none. The Eleventh Circuit's opinion in *McClish* provides no basis for Defendants Richey, Roberts, and Leigh to have known they were violating Moore's constitutional rights. In that case, the officers pulled the defendant out of his house as soon as he answered his door. *McClish*, 483 F.3d at 1242. The Eleventh Circuit found the arrest unconstitutional. But the Eleventh Circuit also concluded that it was not clearly established that the officer's conduct was unlawful to defeat qualified immunity. *Id.* This case is far different from *McClish*. In that case, the suspect remained completely within his house. *Id.* at 1241. He made no move to get anything from inside the house and never crossed the threshold with even a hand. The officer simply saw him in this house, reached inside the house, and arrested him. Indeed, the officer conceded there were no exigent circumstances. *Id.* Moore had at least an arm outside the house. Defendant Richey grabbed that arm. Dkt. 100-4 at 34. And it is undisputed that Moore struggled against the officer, backed into her home, and motioned to pick something up — pulling the officers

in with her. It is also undisputed that the officers believed she might grab a weapon. Dkt. 100-3 at 41. Moore has failed to meet her burden of showing that a reasonable officer would have clearly known that Moore's arrest was unlawful.

The Court thus grants Defendants Roberts's, Leigh's, and Richey's motions for summary judgment as to Count Two of the amended complaint.

### 3.    Excessive Force (Count Four)

Defendants Leigh, Richey, and Roberts also argue they are entitled to qualified immunity on Moore's excessive force claim because the amount of force used to arrest her was objectively reasonable.[11]

"[A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard' . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted). It is well settled that some

---

[11] As explained above, Moore appears to bring an excessive force claim only against Defendant Richey. In an apparent abundance of caution, Defendants Roberts and Leigh argue they are also entitled to qualified immunity on this claim.

force can be used when completing an arrest. *Id.* at 396. When analyzing whether the force has been excessive, a court considers the fact that police officers must make "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Whether the force was "reasonable" "requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (citing *Graham*, 490 U.S. at 396). "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). As the Supreme Court recently explained:

> The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case. And the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

*Id.* at 1546–47 (citations and quotations omitted).

To overcome qualified immunity, Plaintiff must show that that the Officers' force constituted a constitutional violation and that the law was clearly established. The Eleventh Circuit has identified three factors to evaluate for determining if the force used by an officer in making an arrest was objectively reasonable: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 (11th Cir. 2017) (citing *Vinyard*, 311 F.3d at 1347).[12]

All these factors favor these three Defendants. First, the circumstances demonstrated a need for the application of force. Defendant Richey tased Plaintiff during a struggle in which Plaintiff resisted arrest. The officers asked her repeatedly to place her hands behind her back and submit to the arrest. She refused, fighting against the officers. The officers warned her twice during the struggle that they

---

[12] Plaintiff claims to have blacked out three times while being arrested. Per the audio recording, the time between when Plaintiff was told to exit the house and when the police officers handcuffed Plaintiff stretched for one minute and thirteen seconds. Dkt. 102-3 at 8:17–9:30. The Court notes that for the purposes of making a determination of excessive force all three of Plaintiff's blackouts occurred within this period of one minute and thirteen seconds.

would tase her if she did not comply. Indeed, Defendants might have understood using the taser as a way of preventing further resistance. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) ("The single use of the taser gun may well have prevented a physical struggle and serious harm to [the officer].").  In *Draper*, the court found that the use of a taser was appropriate when the plaintiff was "hostile, belligerent, and uncooperative." *Id*.  Here, from the police officer's perspective in the moment, Plaintiff was uncooperative and hostile.

Second, the amount of force was not disproportionate to the need for force.  The Eleventh Circuit has stated that tasers are "at most — moderate, non-lethal force." *Buckley v. Haddock*, 292 F. App'x 791, 795 (11th Cir. 2008).  Defendant Richey fired the taser once while arresting Moore.  Plaintiff claims he tased her more than once but provides no evidence to support her claim.  Defendant Richey testified he tased her only once.  Dkt. 100-4 at 41.  Defendant Roberts also testified that Defendant Richey used the taser once, Dkt. 100-5 at 27, and Defendant Leigh testified that, because he focused on Moore's hands, he did not know how many times Defendant Richey tased Moore.  Dkt. 100-3 at 51.

The taser log shows that the taser was only fired once.  Dkt. 102-6 at 19–21.  The recording also suggests Defendant Richey used it only once.  He threatened to use it again but did not.  Dkt. 102-3 at 00:10:28–00:11:30:00.  The Court concludes Defendant Richey fired the taser once.  *See Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) ("[W]hen 'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it,' a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment.").  But even if he used it more than once, the Eleventh Circuit has approved multiple taser uses when the arrestee is not submitting to control.  *Floyd v. Corder*, 426 F. App'x 790, 791 (11th Cir. 2011); *Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012).

Third, Moore alleges no injury from the taser. After the arrest, Defendants asked Moore if she needed medical attention, and she stated that she did not.  Dkt. 100-4 at 45–46.  The recording contains no evidence of an injury.

The Court therefore concludes that Moore has failed to meet her initial burden of showing that Defendant Richey's use of the taser was

excessive and violated her constitutional rights. The Court also finds that — even if it did — Moore has not carried her burden of showing that a reasonable officer would have clearly known the use of a taser in this situation was unconstitutional.

Moore points to two cases to support her excessive force claim. First, Moore argues that her case is much like *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), where the Eleventh Circuit denied the defendant's motion for summary judgment on an excessive force claim. In *Fiorino*, however, officers tased the plaintiff eight times over a period of several minutes, with each shock lasting five seconds. *Id.* at 906. The police did not believe he had committed a crime and were not trying to arrest him. *Id.* The plaintiff had not threatened the officers. *Id.* Indeed, the officers continued to tase the plaintiff long after he was incapacitated as he was lying on the ground writhing in pain. *Id.* at 902. He ultimately died "as a result of 'being struck by the taser.'" *Id.* at 905. Here, Defendant Richey tased Moore once as she resisted arrest. In fact, the *Fiorino* court noted that "the use of an initial, single Taser shock to calm the suspect may have been justified." *Id.* *Fiorino* does not support in any way

Moore's claim that the Defendants' conduct violated her constitutional rights.

Moore also cites *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, which found that the police tasing a suspect five times over a two-minute period constituted excessive force. 810 F.3d 892, 899 (4th Cir. 2016). This case does not support Plaintiff's claim for three reasons. First, *Armstrong* was decided after the events at issue here, and it is from the Fourth Circuit. So it does not constitute clearly established precedent. *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (court evaluating a claim of qualified immunity must "determine whether that right was clearly established at the time of the alleged violation") (citation omitted); *Jenkins v. Talladega City Bd. Of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 2002) ("In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.").

Second, the Fourth Circuit views the use of tasers as "a serious use of force," while the Eleventh Circuit views the use of tasers as a moderate use of force. *Armstrong*, 810 F.3d at 902; *Buckley*, 292 F. App'x at 795.

Third, *Armstrong* is factually different. In *Armstrong*, the police tased the plaintiff five times over a two-minute period. 810 F.3d at 897. The officers also struggled with him, possibly applying a chokehold, after the tasing ended. *Id.* Here, the police fired the taser once, and there was no significant physical altercation after that. *Armstrong* would not have placed a reasonable officer on notice that Defendant Richey's conduct violated clearly established law.

Viewing the facts in the light most favorable to Moore, the Court finds that the use of force against Moore was reasonable; that is, Moore has failed to show that Defendants violated her constitutional rights. Moreover, even if the Court found any of the officers' conduct excessive, Moore cites no relevant authority that would clearly establish these rights as law. The Court thus grants Defendants Roberts, Leigh, and Richey's motions for summary judgment as to Count Four of the amended complaint.

## C.     Individual Capacity Claims against Defendant Law

Defendant Kurt M. Law moved for summary judgment, arguing Moore's amended complaint states no claims against him. Dkt. 98-1 at 18–19. This is true. Moore does not name him in any count. And he was

not involved in either Moore's arrest (which led to Counts One through Four) or the County's training decisions (which led to Count Five). Moore failed to respond to Defendant Law's argument that she failed to include him in any count of the amended complaint and thus abandons any claims against him. *See Hudson*, 209 F. Supp. 2d at 1324 ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.")

Despite this fatal defect in Moore's pleadings, her amended complaint does appear to allege — in a section separate from that in which Moore sets forth her claims — that Defendant Law's actions constituted "false arrest" in violation of the Fourth Amendment. *See* Dkt. 51 at ¶ 60 ("Defendant Law's actions constitute a false arrest in violation of Plaintiff's constitutional rights . . . ."). But it is undisputed that Defendant Law never arrested her. He got a warrant based on her refusal to let Daley re-enter her home but never executed the warrant. *See* Dkts. 95-3 at 18 (testifying that Defendant Law did not arrest her, and that he never informed her that she was under arrest); 100-7 at 23–24; 100-6 at 22–23. Moore thus cannot sustain a claim for false arrest. *See Elmore v. Fulton Cty. Sch. Dist.*, 605 F. App'x 906, 915 (11th Cir.

2015) ("In general terms, a warrantless arrest without probable cause provides the basis for a § 1983 claim for false arrest.") (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

Rather than respond to this claim, Moore appears to assert for the first time in her response brief that Defendant Law placed her under so-called "house arrest" during her dispute with Daley was ongoing. *See* Dkt. 106 at 29–30 ("[O]nly after the warrant had issued and Plaintiff was under house arrest, did any police officer verify that Plaintiff didn't have any of Daily's [sic] property."). But Moore makes no attempt to define this term, nor does she identify any legal authority that would allow her to premise a Fourth Amendment false arrest claim on such an allegation. Even had Moore properly stated a claim for false arrest against Defendant Law, it would fail as a matter of law.

The Court dismisses Plaintiff's false arrest claim against Defendant Law and any other claims she may have tried to assert against him.

### D. Due Process Claims Against Defendants Leigh, Richey, and Roberts

Plaintiff makes due process claims against Defendants Leigh, Richey, and Roberts. Plaintiff argues that these defendants made false representations with the intent to obtain an arrest warrant. Dkt. 106 at

38.    These claims present bare allegations that are unsupported by citations to the record, and, for that reason, are dismissed.  *Am. Fed'n of Labor & Cong. Of Indus. Orgs.*, 637 F.3d at 1186–87 ("No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 447 U.S. at 322).

Plaintiff also argues that Defendants Leigh and Roberts filed false police reports when they stated that Plaintiff kicked Defendant Richey in the groin because they did not see the kick.  Under Georgia law, however, police officers can rely on a fellow officer's word when drawing conclusions during an investigation.  *Cunningham v. State*, 231 Ga. App. 420, 421–22 (1998).  That they did not see it is thus irrelevant.

The Court grants Defendants Roberts, Leigh, and Richey's motions for summary judgment as to any due process claims that Plaintiff has asserted.

## IV.    CONCLUSION

The Court **GRANTS** Defendants' Motions for Summary Judgment (Dkts. 97, 98, 100, 102).  The Court **DISMISSES** this case with prejudice.

**SO ORDERED** this 29th day of March, 2019.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE